UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WINN-DIXIE STORES, INC., AND
BI-LO HOLDINGS, LLC,

                Plaintiffs,

    v.

AGRI STATS, INC., CLEMENS FOOD
GROUP, LLC, THE CLEMENS FAMILY
CORPORATION, HORMEL FOODS
CORPORATION, HORMEL FOODS, LLC,
INDIANA PACKERS CORPORATION,
MITSUBISHI CORPORATION
(AMERICAS), JBS USA FOOD COMPANY,
JBS USA FOOD COMPANY HOLDINGS,
SEABOARD FOODS LLC,  SEABOARD
CORPORATION, SMITHFIELD FOODS,
INC., TRIUMPH FOODS, LLC,  TYSON
FOODS, INC., TYSON PREPARED FOODS,
INC., AND TYSON FRESH MEATS, INC.,

                Defendants.

Case No.

COMPLAINT

DEMAND FOR JURY TRIAL

**A.    Table of Contents**

A.    Table of Contents............................................................................................i

I.    NATURE OF ACTION ................................................................................1

II.    JURISDICTION AND VENUE ...................................................................3

III.    PARTIES .....................................................................................................4

    A. Plaintiffs...............................................................................................4

    B. Defendants ...........................................................................................5
        (i)    Agri Stats...............................................................................5
        (ii)   Clemens ................................................................................5
        (iii)  Hormel..................................................................................6
        (iv)  Indiana Packers ....................................................................6
        (v)   JBS .......................................................................................7
        (vi)  Seaboard ..............................................................................7
        (vii) Smithfield ............................................................................8
        (viii) Triumph................................................................................8
        (ix)  Tyson ...................................................................................8

IV.    FACTUAL ALLEGATIONS ........................................................................9

    A. Agri Stats' central role in collusion in the broiler industry. ...............9

    B. Agri Stats markets its collusive scheme to Defendants. ...................11

    C. Agri Stats provided Defendants the unique ability to monitor pricing and
    production and discipline co-conspirators that did not comply with the
    anticompetitive agreement....................................................................13

    D. Defendants controlled the supply and production of pork in the United States,
    which allowed the scheme to succeed. ................................................19

    E. The level of concentration in the pork industry was optimal for Defendants'
    collusive scheme...................................................................................22

    F. Defendants took advantage of numerous opportunities to collude. .................26

    G. Defendants implemented capacity and supply restraints during the relevant
    period. ...................................................................................................33

    H. Abnormal pricing during the relevant period demonstrates the success of the
    collusive scheme...................................................................................43

I.  Overcharges due to the cartel were reflected in higher pork prices. ................ 45

J.  Defendants actively concealed the conspiracy and Plaintiffs did not and could not have discovered Defendants' anticompetitive conduct. .................................. 48

V.      ANTITRUST INJURY .......................................................................................... 52

VI.     VIOLATION OF SECTION 1 OF THE SHERMAN ACT ................................. 52

VII.    REQUEST FOR RELIEF ..................................................................................... 54

VIII.   JURY TRIAL DEMANDED ................................................................................. 55

## I.      NATURE OF ACTION

1.      Defendants are the leading suppliers of pork in an industry with approximately $20 billion in annual commerce. The United States pork industry is highly concentrated, with a small number of large producers in the United States controlling supply. Defendants and their co-conspirators collectively control over 80 percent of the wholesale pork market.

2.      Defendants Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, The Clemens Family Corporation ("Clemens"), Hormel Foods Corporation, Hormel Foods, LLC ("Hormel"), Indiana Packers Corporation, Mitsubishi Corporation (Americas) ("Indiana Packers"), JBS USA Food Company, JBS USA Food Company Holdings ("JBS" or "JBS USA"), Seaboard Foods LLC, Seaboard Corporation ("Seaboard"), Smithfield Foods, Inc. ("Smithfield"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. ("Tyson"), entered into a conspiracy from at least 2009 to the present (the "relevant period") to fix, raise, maintain, and stabilize the price of pork.[1] Defendants implemented their conspiracy by agreeing with their competitors to restrict output and limit production with the express intended purpose and expected result of increasing and stabilizing pork prices in the United States. In furtherance of the conspiracy, Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume and demand through their co-conspirator, Defendant Agri Stats.

3.      Beginning in at least 2009, Agri Stats began providing highly sensitive "benchmarking" reports to Defendants. Benchmarking allows competitors to compare their profits

---

[1] For the purposes of this complaint, pork includes pig meat purchased fresh or frozen, smoked ham, sausage, and bacon.  From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

1

or performance against that of other companies. However, Agri Stats' reports are unlike those of other lawful industry reports. Agri Stats gathers detailed financial and production data from each of the Defendants, standardizes this information, and produces customized reports and graphs for the co-conspirators. The type of information available in these reports is not the type of information that competitors would share with each other in a normal, competitive market. Instead, the provision of this detailed information acts as the modern equivalent of the proverbial smoke-filled room of the cartels of yesteryear. Agri Stats collected Defendants' competitively sensitive supply and pricing data and intentionally shared that information through detailed reports it provided to them. On a weekly and monthly basis, Agri Stats provides Defendants with current and forward-looking sensitive information (such as profits, costs, prices and slaughter information), and regularly provides the keys to deciphering which data belongs to which producer. The effect of this information exchange was to allow Defendants to coordinate their anticompetitive conduct, monitor each other's production and hence control supply and price.

4.      This data exchange through Agri Stats is a classic enforcement mechanism of a price-fixing scheme.  First, the data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[2]  Second, information contained in Agri Stats reports is specific to pork producers, including information on profits, prices, costs and production levels, instead of being aggregated as industry averages, thus providing transactional specificity and easy identification of specific producers. Third, none of the Agri Stats information was publicly available. Agri Stats is a subscription service which required

---

[2] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

the co-conspirators to pay millions of dollars over the relevant period – far in excess of any other pricing and production indices.  Agri Stats ensured that its detailed, sensitive business information was available only to the co-conspirators and not to any buyers in the market.

5.     Defendants admitted that they discussed production cuts and communicated to each other that no supply increases take place.

6.     In addition, there are numerous "plus factors" in the pork industry during the relevant period, including but not limited to multiple industry characteristics which facilitate collusion, such as vertically integrated operations, high barriers to entry, high pork industry consolidation and concentration, inelastic supply and demand, and a lack of significant substitutes for pork.

7.     Defendants' restriction of pork supply had the intended purpose and effect of increasing pork prices to Plaintiffs.  Beginning in 2009, Defendants' earnings began to increase, as they took an increasing amount of the profits available in the pork industry.  As a result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for pork during the relevant period.  Such prices exceeded the amount they would have paid if the price for pork had been determined by a competitive market, without Defendants' anticompetitive behavior. Thus, Plaintiffs suffered injury and damages due to Defendants' anticompetitive conduct.

## II.     JURISDICTION AND VENUE

8.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16

of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

10. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

11. This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of pork throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

12. The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

13. No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.     PARTIES

#### A.  Plaintiffs

14. Plaintiff Winn-Dixie Stores, Inc. is a corporation organized under the laws of the State of Florida. Its principal place of business is 8934 Prominence Parkway, #200, Jacksonville, Florida 32254. During the Conspiracy Period defined below, Plaintiff purchased pork directly from one or more Defendants and suffered antitrust injury as a result of the violations alleged in

4

this Complaint.

15.     Plaintiff Bi-Lo Holdings, LLC is a limited liability company organized under the laws of the State of Delaware. Its principal place of business is 8934 Prominence Parkway, #200, Jacksonville, Florida 32254.   During the Conspiracy Period defined below, Plaintiff purchased pork directly from one or more Defendants and suffered antitrust injury as a result of the violations alleged in this Complaint.

## B.  Defendants

### (i)     Agri Stats

16.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Eli Lilly & Co.  Throughout the relevant period, Agri Stats acted as a co-conspirator and committed acts in furtherance of the conspiracy by facilitating the exchange of confidential, proprietary, and competitively sensitive data among Defendants and their co-conspirators.

### (ii)    Clemens

17.     Clemens Food Group, LLC is a limited-liability company headquartered in Hatfield, Pennsylvania.   During the relevant period, Clemens Food Group, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

18.     The Clemens Family Corporation is a Pennsylvania corporation headquartered in Hatfield, Pennsylvania, and the parent company of Clemens Food Group, LLC.   During the relevant period, The Clemens Family Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

     (iii)   <u>Hormel</u>

19.    Hormel Foods Corporation is a Delaware corporation headquartered in Austin, Minnesota.  During the relevant period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates, including but not limited to Hormel Foods, LLC sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

20.    Hormel Foods, LLC is a Minnesota corporation headquartered in Austin, Minnesota.  Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation.  During the relevant period, Hormel Foods Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

     (iv)   <u>Indiana Packers</u>

21.    Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana.  During the relevant period, Indiana Packers Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.  Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

22.    Mitsubishi Corporation (Americas) is a New York corporation headquartered in New York, New York.  Mitsubishi Corporation (Americas) is a parent company of Indiana Packers Corporation and a wholly owned subsidiary of Mitsubishi Corporation, a Japanese Corporation. During the relevant period, Mitsubishi Corporation (Americas) and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through

its wholly owned or controlled affiliates, to purchasers in the United States

(v)      JBS

23.     JBS USA Food Company is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world.  JBS USA Food Company is a Delaware corporation, headquartered in Greeley, Colorado.  During the relevant period, JBS USA Food Company and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

24.     JBS USA Food Company Holdings is a Delaware corporation, headquartered in Greeley, Colorado.  JBS USA Food Company Holdings is an indirect wholly owned subsidiary of Brazilian-based JBS SA.  During the relevant period, JBS USA Food Company Holdings and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

(vi)     Seaboard

25.     Seaboard Foods LLC is a limited-liability company headquartered in Shawnee Mission, Kansas, and is a wholly owned subsidiary of Seaboard Corporation.  During the relevant period, Seaboard Foods LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

26.     Seaboard Corporation is a Delaware corporation headquartered in Merriam,

Kansas, and is the parent company of Seaboard Foods LLC.  During the relevant period, Seaboard Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

       (vii)   <u>Smithfield</u>

     27.    Smithfield Foods, Inc. is incorporated in the Commonwealth of Virginia, and an indirect wholly owned subsidiary of WH Group Limited, a Chinese company.  Smithfield Foods is headquartered in Smithfield, Virginia.  During the relevant period, Smithfield Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

       (viii)   <u>Triumph</u>

     28.    Triumph Foods, LLC is a limited-liability company headquartered in St. Joseph, Missouri.  During the relevant period, Triumph Foods, LLC and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

       (ix)   <u>Tyson</u>

     29.    Tyson Foods, Inc. is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the relevant period, Tyson Foods, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

     30.    Tyson Prepared Foods, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the relevant period, Tyson Prepared Foods, Inc. sold pork in interstate commerce, directly or through its wholly-owned

or controlled affiliates, to purchasers in the United States.

31.     Tyson Fresh Meats, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.  During the relevant period, Tyson Fresh Meats, Inc. sold pork in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

## IV.     FACTUAL ALLEGATIONS

32.     Starting at least as early as January 1, 2009 and continuing to the present, Defendants coordinated to fix, raise, maintain and stabilize pork prices. To implement and enforce their anticompetitive agreement, Defendants relied on a unique industry data sharing service known as Agri Stats, through which Defendants shared and monitored critical, competitively sensitive business information regarding each other's production metrics, serving a critical role in Defendants' price-fixing scheme, and resulting in a stable, successful anticompetitive cartel.

### A.  Agri Stats' central role in collusion in the broiler industry.

33.     Agri Stats has played a central role in collusion in other industries, including involvement in the Broiler industry.[3]  As alleged in the *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.), the Broiler producers used Agri Stats to implement their conspiracy to restrain production and inflate prices.

34.     In the Broiler industry, Agri Stats collected and disseminated to the other members of the conspiracy disaggregated financial information (such as monthly operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels, and sales data by finished product form and type, amongst other competitively sensitive business

---

[3] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

information. Agri Stats reports contain line-by-line entries for plants, lines, and yields of various Broiler facilities.  Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each Broiler producer's facilities, sometimes directly contacting the Defendants to verify the data. Agri Stats also provided detailed price reports to the Broiler industry through its subsidiary, Express Markets, Inc., also known as EMI.  Agri Stats collected data from the Broiler producers weekly and provided its reports to Broiler producers weekly and monthly.

35.    The detail of these reports ensured that the broiler chicken producers could quickly decode the information of their purported competitors. It was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual Broiler complexes and facilities. The Broiler reports, in parts, contained so few producers participating that the identities were obvious.  Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger Broiler defendants such as Tyson. Agri Stats purposefully circulated this information to top executives to facilitate their agreement on supply constraints and price.

36.    In the Broiler industry, Agri Stats – known to its co-conspirators as a willing conduit for illicit information exchanges – conveyed information to the broiler chicken Defendants that furthered the conspiracy's purposes by reassuring them that production cuts would continue, and inducing the broiler chicken Defendants to continue to act in concert to ensure that the cuts continued. Agri Stats' statements in the Broiler industry facilitated the implementation of the agreement to restrict supply.

37.    When it denied defendants' motions to dismiss in *In re Broiler Chicken Antitrust Litigation,* the district court noted that given the nature of the Agri Stats reports, the defendants

were sharing future anticipated production information, which raises significant antitrust concerns.[4]

**B. Agri Stats markets its collusive scheme to Defendants.**

38.     Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to Defendants similar to the benchmarks used to restrict competition in the Broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies.[5] Benchmarking of the type undertaken by Agri Stats and its co-conspirators reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition.  This is especially true where benchmarking involves the exchange of commercially sensitive information among competitors.

39.     In 2008, Greg Bilbrey of Agri Stats wrote in the Advances in Pork Production Journal that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. *Each and every commercial swine operation is encouraged to participate in some benchmarking effort.*"[6]

40.     Agri Stats emphasized to pork producers that the goal of the agreement to share information was profitability, not production, and invited them again to participate in the

---

[4] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637 (N.D. Ill. Nov. 20, 2017), ECF No. 541.
[5] *Antitrust Issues Related to Benchmarking and Other Information Exchanges*, Federal Trade Commission (May 3, 2011), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/antitrust-issues-related-benchmarking-and-other-information-exchanges/110503roschbenchmarking.pdf (last visited June 4, 2019).
[6] Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, 43 (2008).

benchmarking.   Agri Stats emphasized that "We must remember that the ***ultimate goal is increasing profitability*** – not always increasing the level of production." Finally, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program***."[7]

41.     In April 2009, Agri Stats again invited swine producers to design and operate their own benchmarking effort. Thus, Greg Bilbrey of Agri Stats wrote: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort.***"[8] Defendants accepted this offer and, beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports. Their agreement  was to use the exchanged benchmarking information to coordinate supply and stabilize and increase prices of pork sold in the United States, provide and receive information from Agri Stats, and use this detailed sensitive information to monitor each other's production and pricing. The agreement was successful as pork prices rose significantly after the agreement was reached.

42.     The volume of U.S. commerce in the pork industry is enormous. Total pork sales in the United States for a portion of the Conspiracy Period were:

    2016 - $18.9 billion
    2015 - $21.0 billion
    2014 - $26.4 billion
    2013 - $23.4 billion

---

[7] *Id*. at 41-46.

[8] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009) (emphasis added).

43.     Each Defendant's annual sales of pork products are also very large. For example, in 2016 Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits.

   **C.   Agri Stats provided Defendants the unique ability to monitor pricing and production and discipline co-conspirators that did not comply with the anticompetitive agreement.**

44.     Agri Stats provided Defendants with an unparalleled ability to share critical, proprietary and commercially sensitive information concerning key business metrics, such as production levels and short and long-term production capacity.  Agri Stats was central and critical to the formation, operation and continuing stability of the Defendants' anticompetitive scheme. To effectuate their agreement, Defendants had to ensure that each member was following through with the agreement by limiting their production and stabilizing prices.  Agri Stats served that function.

45.     Each member of the conspiracy, including Defendants Clemens, Hormel, Indiana Packers, JBS USA, Seaboard, Smithfield, Triumph, and Tyson, and other pork producers, was an Agri Stats subscriber and reported its information to Agri Stats.  Agri Stats' parent company, Eli Lilly, stated that "***over 90% of the poultry and pig market***" uses Agri Stats in the United States.[9]

46.     Agri Stats collects commercially sensitive financial and production data electronically each month from each Defendant. Internal auditors convert the data, prepare it for comparison, and perform the monthly audits. Each company's financial data is reconciled to its general ledger to help ensure actual costs are reported. Raw data are used in Agri Stats'

---

[9] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016).

standardized calculations so all company numbers are calculated and reported the same way.[10]

47.     Defendants received monthly detailed reports and graphs that allow them to compare their performance and costs to other participants, the average of all companies, the top 25 percent and the top five companies.   Current month, previous quarter and previous twelve-month periods are reported.   As of 2009, each monthly report contained nine sections for analysis and comparison: Performance Summary, Feed Mill, Ingredient Purchasing, Weaned Pig Production, Nursery, Finishing, Wean-to-Finish, Market Haul, Profit and Sales.[11]   Participants may also have received an abbreviated Key Performance Indicator report, as well as historical graphs.[12]

48.     Due to a hog's life and production cycle, even current and historical information regarding hog production numbers provides forward-looking supply information to competitors. The typical hog production cycle lasts about 4 years, in large part due to a hog's biological cycle. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and raise the resulting crop of piglets, it takes nearly 2 years to substantially increase production.

49.     One presentation from Agri Stats shows the level of detail provided to Defendants regarding profits in the pork market:[13]

---

[10] Greg Bilbrey, *Implementing Simple and Useful Production Benchmarking*, London Swine Conference – A Time for Change (March 28-29, 2012).
[11] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 8.
[12] Greg Bilbrey, *Benchmarking and Cost-Production Relationships*, *supra* note 6.
[13] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

**Top 25% in Profit - Variances to Average Company - 2009-2007**

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | 8 | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 35,001,089 Pigs Finished | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 30,785,319 Pigs finished | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 | |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 5 | | 3 | |
| 22,306,500 Pigs finished | | | | | | | | | | | | |

50. The purpose of these reports was not to provide better prices to customers or to lower the costs of production. Instead, it was to improve Defendants' profitability by enabling them to restrict output and raise prices. The Agri Stats report referenced above shows the ranking of each company in profitability, and compares the company to its competitors by providing the variance from the average. On information and belief, the Agri Stats report actually circulated to competitors contained even more detail. The same presentation informed Defendants that one of the "Advantages for Top 25% in Profit" was the "Sales Price: $2 - $6/ckg." (ckg refers to 100 kilograms.) This underscores that the purpose of these reports was not to allow customers to save more money through lower prices and more efficient production – in fact, the opposite was true; the purpose was Defendants' profitability and the result was higher prices for pork customers.

51. Much of the information shared by Defendants through Agri Stats was not

15

necessary to achieve any benefits for customers. Exchanging individual company data (particularly current data on prices and costs) is not required to achieve major efficiencies.[14]

52.      Agri Stats knew that it played a central role in this conspiracy.  Agri Stats repeatedly touted its role in standardizing the costs across companies – allowing the companies to compare the "apples to apples" of its data analysis among competitors. In one presentation, Agri Stats pointed out to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data:[15]

## Data Integrity

- Benchmarking is very important but it is hard to make sure data is comparable across companies.
- Even if all companies include the same costs the costs can be calculated differently.
- Lots of variation in cost accounting in industry.
- Companies can select key metrics, common calculations and implement an effective benchmarking program.



---

[14] *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf (last visited June 4, 2019).
[15] Greg Bilbrey, *Data Integrity*,   Slideshare.net (Sept. 21,   2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations (last visited June 4, 2019).

53.    Agri Stats stated that to ensure data contained in the reports was accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine *tolerance and outlier status and enforce*," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, *"[e]ach participant has to commit*."[16]

54.    In addition to these reports, Agri Stats' account managers conducted on-site live reviews to assist with report utilization and analysis.[17]   The information provided by Agri Stats was so detailed that clients frequently requested the site visits by Agri Stats employees to assist the co-conspirators in understanding the intricacies and implications of the data.

55.    In May 2015, a subsidiary of Agri Stats, Express Markets, announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers.  Express Markets had provided its extensive pricing reports to Broiler producers since 2003.[18]

56.    By providing detailed production statistics by participants, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated production limits.  Critically, Agri Stats provided forward-looking data that allowed the other Defendants to determine each other's future production in addition to their current production.

57.    Agri Stats reports are organized by company and facility, but their names are not listed in the reports.  Nevertheless, while nominally anonymous, the reports contain such detailed

---

[16] *Id.*
[17] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *supra* note 8.
[18] Steve Meyer, *Paragon Economics Sold to Express Markets*, National Hog Farmer, May 26, 2015, *available at* https://www.nationalhogfarmer.com/marketing/paragon-economics-sold-express-markets (last visited June 4, 2019).

figures covering every aspect of pork production and sales that participants can accurately identify the companies behind the metrics.  For example, long-time industry insiders are sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size.

58.    Moreover, Agri Stats knew that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers, but reassigning numbers was an undertaking the company was not eager to embark on.

59.    Suppliers received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information.  Within these smaller monthly books, each supplier's own rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating whose numbers were inside the book.  The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not revealed.

60.    Agri Stats mailed the reports to customers.  On occasion, Agri Stats shipped a participant's book to one of its competitors.  At times, suppliers just kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

61.    Mobility within the meat production industries led to a situation where many workers at most pork integrator operations knew the numbers of other regional facilities, removing any anonymization of the data which may have existed.  Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers.  Those working at Agri Stats were aware of this fact, but did nothing to address it.

62.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplies the data necessary to coordinate production limitations and manipulate prices, but also in its stabilizing power.  Anticompetitive cartels are subject to inherent instability in the absence of policing mechanisms, as each individual member of the cartel may have incentive to cheat on other members of the cartel, for example, by ramping up pork production to capture higher prices as other cartel members limit production.  Agri Stats' detailed production statistics serve as an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

63.     In a February 15, 2017, Bloomberg article relating to Agri Stats' roles in the Broiler industry, it was reported:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual."  He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state.  Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another.  Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows co-conspirators to make sure they're all following through on the agreement.  "This is one of the ways you do it.  You make sure that your co-conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says.  "*That is what creates stability for a cartel*."[19]

**D.     Defendants controlled the supply and production of pork in the United States, which allowed the scheme to succeed.**

---

[19] Christopher Leonard, *Is the Chicken Industry Rigged*, Bloomberg (Feb. 15, 2017), *available at* https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (emphasis added) (last visited June 4, 2019).

64.     The relevant period was further characterized by the increased control over the breeding, production, growing, and processing of pork by the Defendants through vertical integration and the exclusive production contracts with pork farmers.

65.     Vertical integration is so pervasive that Defendants are commonly called pork or swine integrators by the industry, government, analysts, and academics.   Vertical integration allows the integrator Defendants to directly control the production and supply of pork through their wholly owned and operated farms where the hogs are raised, fed, and prepared for slaughter.

66.     Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."[20]   This arrangement essentially converts independent farmers into contract employees that perform services for the pork integrator.   The Defendants typically pay only fixed service fees to the farmers, who bear the investment costs of the hog-raising facilities.   The pork integrators (i.e., Defendants) typically retain ownership of the hogs and set the terms for how they are raised, allowing them to further control the supply of the pork on the market.   The prevalence and use of contracts for hog production by Defendants increased significantly during the course of the conspiracy.

67.     For example, during the relevant period Defendant Smithfield has the distinction of being the largest producer and processer of pork in the United States.   In 2014, Smithfield had approximately 500 company-owned farms and approximately 2,190 contract farms in the United States.   Smithfield described its arrangement with contract farms as follows:

---

[20] Allen Harper, *Hog Production Contracts: The Grower-Integrator Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.[21]

68.    In its 2017 SEC 10-K report, Defendant Seaboard Corporation states that it raises "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts."[22]

69.    Defendant Clemens Food Group touts its vertical coordination on its website stating that, "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[23]   A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a network of 250 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[24]

70.    The Defendants further control the manner in which the pork is processed and have the ability to restrict and reduce supply through a number of means including capacity reductions, controlling slaughter rates, and exports.   Several Defendants including Smithfield, Clemens, Tyson, and Hormel have divisions or subsidiaries that sell packaged pork under various name brands.

---

[21] Smithfield Foods Annual Report, at p. 27 (2014).

[22] Seaboard Corporation Annual Report, at p. 2 (2017).

[23] *See* Clemens Food Group, *Vertically Integrated Purposefully Coordinated*, *available at* http://www.clemensfoodgroup.com/our-company/vertically-coordinated (last visited June 4, 2019).

[24] *See id.; see also* The Clemens Family Corporation Companies, *available at* http://www.clemensfamilycorp.com/pages/companies.aspx (last visited June 4, 2019).

21

E.   **The level of concentration in the pork industry was optimal for Defendants' collusive scheme.**

71.    The United States Department of Agriculture ("USDA") has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."[25]

72.    The hog integration sector is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production).  Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance.

73.    Prior to and in the beginning of the relevant period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork integrators controlling a large amount of market share.  Between 1988 and 2015, the top four pork integrators (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to just under 70 percent by 2015.  As shown in Figure 1 below, the top eight integrators had market share of well over 80 percent for the entire relevant period:

---

[25] John King (USDA), *Concentration and Technology in Agricultural Input Industries*, at p. 2 (Mar. 2001).

**Figure 1: Market Share of Top 8 Pork Integrators 1991-2017**



Source: USDA Packers and Stockyards Program Reports (PSP) 1998-2006, Daily Slaughter Capacity Published by EMI.Inc.
Notes: 2007-2017 Market Share by Top 8 Hog Integrators were estimated from Integrator's Daily Slaughter Capacity.

74.    In July 2015, JBS USA announced it would acquire Cargill's pork business for $1.45 billion.   The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States, behind only Smithfield.

75.    The acquisition was completed in October 2015 and resulted in further consolidation in the industry.   The resulting pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week.[26]   After the acquisition closed, the new JBS-Cargill entity was twice

---

[26] *See* NOTICE TO MARKET: JBS Concludes Cargill Pork Acquisition (Oct. 30, 2015).

as large as the next largest pork integrator (Hormel) and four times larger than the fifth and sixth

largest firms (Triumph and Seaboard, each with under five percent of the national slaughter

capacity).[27]

76.     As shown in Figure 2 below, by 2016, the top six pork processors comprised 82%

of the total market.  On their own, none of these competitors could exercise market power.  But

acting as a whole to manipulate the price of pork products, the combined market share of the six

largest Defendants translates into an HHI[28] of 6724 (ignoring other pork processors that comprise

the other 18% of the market), which is well above the threshold for highly-concentrated markets.

In other words, if Defendants colluded with one another to restrict the supply of pork in the market,

as alleged herein, the resulting market concentration of such concerted action gave them more than

sufficient power to control the pork market.  Even without combining the largest six Defendants,

the pork industry has a "moderately concentrated" HHI of 1532.

---

[27] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), at p. 4.
[28] "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice.  *See* https://www.justice.gov/atr/herfindahl-hirschman-index.  An HHI value of 1,500 to 2,500 suggests a market is moderately concentrated.  An HHI in excess of 2,500 points suggests a market is highly concentrated.

**Figure 2: 2016 Pork Processing Market Shares**[29]

| Company | Share | HHI - Independent | HHI - Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | 6724 |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | |
| Others | 18% | 18 | 18 |
| | | | |
| **Total** | **100%** | **1532** | **6742** |

77.     The concentration level in the pork integration industry was optimal for collusion. WH Group Limited, the parent company of Smithfield, characterized the U.S. pork integration industry as "relatively mature and concentrated." [30]  Both of these factors – maturity and concentration – make an industry more susceptible to collusion.

78.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion.  Because the industry was dominated by a handful of integrators, it was feasible to manipulate price through an agreement among the relatively few dominant players, whose market power greatly simplified the organizational complexity of the price-fixing agreement.  Further, because none of the largest integrators were capable of independently controlling prices on their own, such an agreement was necessary to inflate prices.

79.     Concentration of the industry is also beneficial to the procurement of hogs by the pork processors.  In some regions, consolidation has resulted in cases where only one pork processor is left to buy hogs from independent farmers, leaving the farmers with no leverage when

---

[29] Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (Mar. 7, 2017).
[30] WH Group Interim Report, at p. 5 (2017).

negotiating terms with the pork processors.[31]

80.     Large barriers to entry kept potential competitors out of the pork integration industry.  New entry into pork processing is costly and time consuming.  Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs are substantial.  In 2012, it cost Cargill $25 million just to expand an existing facility.  Building a facility from scratch would be considerably more, totaling hundreds of millions of dollars.[32]

81.     The prevalence of contracts in the market for hogs also serves as a barrier to entry. Most of the hogs produced in the U.S. are sold under a multi-year contract, typically to one of the Defendants.  And in other situations, the processor owns the hog from farrow to finish.  Even if a market entrant was able to outlay capital for the production of a new processing facility, it would have trouble finding enough hogs to operate that facility profitably.[33]

**F.  Defendants took advantage of numerous opportunities to collude.**

82.     Defendants are members of several industry trade associations and other forums, which they used to facilitate their conspiratorial conduct.  Pork producers have many annual and other events through which they can communicate with one another in person, and Defendants' CEOs and top-level executives regularly attend these events.

83.     All pork producers and importers in the United States participate in a legislatively-

---

[31] Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (Aug. 2010), at pp. 3 and 11.
[32] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), at p. 7.
[33] Timothy A. Wise and Sarah E. Trist, *Buyer Power in U.S. Hog Markets: A Critical Review of the Literature*, Global Development and Environment Institute, Working Paper No. 10-04 (Aug. 2010), at p. 12.

mandated "Pork Checkoff," under which they pay an assessment when pigs are sold or pigs are imported into the United States.  The money is used for programs to increase pork sales and exports, for research, and for producer and consumer education programs; funds cannot be used for lobbying or to influence government policy.  The assessment amount and the amount to be returned to state pork associations for local programs is set annually by the Pork Act Delegate Body, which meets during the National Pork Producers Council's annual Pork Industry Forum. States are represented in the Delegate Body in proportion to their level of hog production, and each state is eligible to elect at least two Delegates.  Executives from several producer defendants have served as Pork Act Delegates.

84.     The Pork Act Delegates also elect a 15-member National Pork Board ("Pork Board"), whose members are officially appointed by the U.S. Secretary of Agriculture.  The Pork Board works with Pork Checkoff staff to ensure collection and distribution of Pork Checkoff funds. Pork Board meetings have occurred in conjunction with a number of the important annual trade association meetings described below, including the National Pork Producers Council Pork Industry Forum, the National Pork Industry Conference, and the World Pork Expo.  Executives from several producer defendants have served as members of the Pork Board.  For example, at least three executives associated with Smithfield Foods (Conley Nelson, Chris Hodges, and Michael Skahill) have served on the National Pork Board or its staff.  Skahill is the Pork Board's current Treasurer.

85.     According to its website, "[t]he National Pork Producers Council ["NPPC"], which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world

markets."  Executives from the pork integrator defendants have served on the NPPC Board of

Directors during the relevant period, including: Cory Bollum of Hormel Foods, Don Butler of

Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of

Tyson Fresh Meats.

86.     NPPC conducts its annual business meeting and election of officers and directors

during its "National Pork Industry Forum" typically held in early March each year.  NPPC

advertises the National Pork Industry Forum as an opportunity for networking, as well as attending

educational sessions.  The event includes a candidate meet and greet, state caucuses, meals and

receptions, and delegate sessions.

87.     In addition to its annual National Pork Industry Forum, NPPC sponsors many other

programs that have provided ample opportunities for Defendants to meet with each other in person,

including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show."  It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry-related organizations (including tours of producer farms).  The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.
- Legislative Action conferences each spring and fall in Washington DC.
- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

88.     The National Pork Industry Conference ("NPIC") has taken place in the Wisconsin

Dells each July since 2010 (and in the Ozarks before that).  Descriptions on the conference website

have said that NPIC "is the largest annual conference in the US that is held for the swine industry,"

and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production

systems in North America."  After the 2009 conference, Mark Greenwood, a Senior VP at lender

Agstar, wrote in "Hog Farmer" that the swine industry must reduce sow numbers by at least

300,000 to 500,000 and urged "the larger production systems" to "follow Smithfield's and Tysons' lead on reducing sow numbers."[34]   In July 2010, the Pork Checkoff website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded."[35]   The website for the 2016 NPIC conference emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts."   Seaboard Foods and Smithfield Foods are among the producer defendants whose executives have been session presenters at NPIC.

89.    Upon information and belief, CEOs and top level executives from Defendants attending NPIC and NPPC events discuss topics with one another relating to pricing, production, and other non-public, proprietary information in a number of informal settings.   These regular, informal, and in-person opportunities to discuss pricing and production in the pork industry give CEOs and top level executives comfort that their competitors remain committed to a plan to artificially restrict pork production.

90.    In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly and privately discuss competitive issues.   For example, the 21st Century Pork Club, founded in 1997 by former NPPC executive Larry Graham, meets twice a year. A March 2011 *AgriMarketing* article about the club states that it consisted of "60 industry stake holders" and that since its inception, the club's two rules have been "nothing that was said in the meeting was to be repeated outside the group, with a name attached" and members will be dismissed from the group if they miss two meetings in a row without a valid reason.

---

[34] Mr. Greenwood was also a presenter at the 2018 NPIC, discussing swine operation financials.
[35] *See National Pork Board to meet during National Pork Industry Conference*, Pork Checkoff (July 8, 2010), *available at* https://www.pork.org/news/national-pork-board-meet-national-pork-industry-conference/ (last visited June 4, 2019).

29

91.     Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the American Meat Institute ("AMI"), and other organizations.

92.     Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association."  AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

93.     NAMI was formed in 2015 by merging the AMI and the North American Meat Association.  The NAMI website contains similar information, stating that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars … provide excellent networking and information-sharing opportunities for members of the industry."

94.     Agri Stats and all of the pork integrator defendants (or their closely-affiliated companies) have been members of AMI and then NAMI throughout the relevant period. Executives from the pork integrator defendants have served on the AMI and NAMI Board of Directors during the relevant period, including:

    a.  Mark Campbell and Rick Hoffman of Triumph Foods;
    b.  Doug Clemens and Phil Clemens of Clemens Family Corporation;
    c.  Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc., as well as Greg Schweitzer of Sara Lee/Hillshire Brands (later acquired by Tyson Foods);

      d.   Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

      e.   Gary Louis, Rod Brenneman, and Terry Holton of Seaboard Foods;

      f.   Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS USA;

      g.   Jim Snee, Stephen Binder, and Jeffrey Ettinger of Hormel Foods Corporation; and

      h.   Gary Jacobson and Russ Yearwood of Indiana Packers Corporation.

95.    Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

96.    Throughout the relevant period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has co-sponsored (with the Food Marketing Institute) the industry's "Annual Meat Conference."  The conference website describes the conference as "a complete education and networking experience."  Many of the Defendants' high-level executives attend the conference.  For example, registered attendees in 2012 included Steven Binder, then the Executive VP President Hormel Business Units of Hormel Foods Corporation, as well as eight other Hormel executives; eight executives from JBS USA; Donnie Smith, then CEO of Tyson Foods, along with twelve other Tyson executives; Chris Hodges, then Senior Vice President of Smithfield Foods, and ten additional Smithfield Foods executives; and Blair Snyder and Brian Snyder, Chairman of the Board and President, respectively, of Agri Stats.

97.    Throughout the relevant period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry."  All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015 and then Vice President of Pork Analysis at Express

Markets, Inc. (a subsidiary of Agri Stats, Inc.) through 2017.  The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and ***industry capacity***." (emphasis added.) The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike.  This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices.  Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years."  The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

98.     Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall.  The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action."  Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015 and Phil Clemens of The Clemens Family Corporation in 2016.

99.     For years, NAMI also sponsored an annual "Meat Industry Management Conference."  NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics."  The NAMI board met during the 2015 Management Conference.

100.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit."  In addition to education sessions, the summit has included "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business."  The 2017 Summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

101.    AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012.  In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

102.    In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations.  Promotional materials for the 2014 IPPE indicated that attendees included Defendants Clemens Food Group, Hormel Foods, Hillshire Brands, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson.  After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

## G. Defendants implemented capacity and supply restraints during the relevant period.

103.    As demonstrated in Figure 3 below, at several points during the relevant period, the pork integrators acted in a concerted way to decrease supply.  In 2009, 2010, and again in 2013,

the pork industry cut production.[36]  (The production dip in 2014 reflected the adverse impacts from

the deadly pig disease, porcine epidemic diarrhea virus, which took place in the spring and summer

of 2014.)   These production decreases marked a drastic change from the period prior to the

conspiracy from 2000 through 2009, in which pork supply was stable and steadily increasing on a

yearly basis.

**Figure 3: U.S. Annual Commercial Hog Production by Weight, 2000-2017**



104.    At the same time, pork producers were further reducing domestic supply by

devoting more and more production exports to overseas markets.  The U.S. has been a net exporter

---

[36] *See* U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); *id.* at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

of pork products for a long time, but those exports have comprised a much larger share of total production in the past ten years.  As shown in Figure 4 below, less than ten percent of U.S. pork production was exported in 2000.  By 2011, more than twenty percent was being exported. Sending production overseas is another way in which Defendants can reduce the supply available to U.S. markets, thereby driving up prices.

**Figure 4: U.S. Pork Exports as a Percent of Total Production, 2000-2017**



105.    These supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply in order to artificially, fix, raise, and stabilize the price of pork.  While Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources.  As with their use of Agri Stats, Defendants exploited these public

statements in order to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy.

106.    For example, in October of 2008, Hormel CEO Jeffrey Ettinger confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[37]

107.    During Hormel's first quarter earnings call in January 2009, Mr. Ettinger once again communicated that he expected supply to decrease in 2009.  Hormel CFO Jody Faragan confirmed that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."[38]

108.    In May 2009, Larry Pope, the CEO and President of Smithfield, stated:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09--*we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down.  We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system*.[39]

109.    In May 2009, Hormel confirmed that "[w]e see a contraction in the overall supply of hogs for the year but not as much as we'd originally anticipated.  And I would expect that prices will be somewhat less than last year, but higher than what we've seen in the first half of the year."[40]

110.    In June 2009, the CEO of Smithfield stated that the current cuts were not enough and more were needed to "fix" the hog industry and that "[s]omebody else has got to do

---

[37] Q4 2008 Hormel Foods Corporation Earnings Call Transcript (Oct. 26, 2008).
[38] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).
[39] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009) (emphasis added).
[40] Q2 2009 Hormel Foods Corporation Earnings Conference Call – Final (May 21, 2009).

something":

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our -- I'll tell you, it's our Texas operation that sells pigs to seaboard. Seaboard knows that. . . . ***That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something.*** We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.[41]

111.   In August of 2009, Tyson Foods, Inc. Chief Operating Officer, James Lochner, confirmed:

> Hog supplies will be down in Q4 year over year but still adequate. ***We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability.*** We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue.[42]

Mr. Lochner continued, "Looking forward in the pork segment we will see a gradual decline in hog supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4."[43]

112.   In August of 2009, Wesley Mendonça Batista, CEO of JBS USA, communicated the start of JBS USA's participation in hog liquidation efforts. Mr. Batista stated, "we are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[44]

113.   In September 2009, the CEO of Smithfield stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

---

[41] Q4 2009 Smithfield Foods Earnings Conference Call – Final (June 16, 2009) (emphasis added).
[42] Q3 2009 Tyson Foods, Inc. Earnings Conference Call (June 26, 2009) (emphasis added).
[43] *Id.*
[44] JBS 2008 Earnings Conference Call (Aug. 13, 2009).

> *We can't solve the problem.  But the answer to that is yes, I have
> had conversations with several sizable, more than sizable large
> producers, in fact very large producers, and I would tell you they
> are doing some liquidation.*  But again, I don't think they can solve
> it.
>
> *I think this industry has got to solve it collectively.*  I do believe
> everyone is now looking, and when I'm talking to people who are
> financially extremely strong and they are cutting back, that's got to
> be a statement about those people who are not financially strong.
> *But the answer is, yes, there are others cutting back.  We're not
> the only one.*[45]

114.    In December of 2009 the CEO of Smithfield confirmed it had done its "fair share"

to cut supply and communicated that others needed to continue cutting supply to "put this industry

back in balance":

> We continue to take a leadership role there and we have continued
> to take sow reductions and liquidation in our own herds and all of
> that has essentially been completed from Smithfield's side, so I
> think we've certainly done more than our fair share in terms of what
> this industry needs . . . .   I can tell you that I know in the east, its
> [sic] been pretty public about some of the producers on the east coast
> that have been cutting back besides ourselves.  We are getting a little
> more information in the Midwest and I am saying that I have not
> seen the significant Midwest reduction that would probably be
> needed to put this industry back in balance.[46]

115.    In March 2010, when asked about fourth quarter and 2011 volumes for pork, Larry

Pope, the CEO of Smithfield, indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year.  That's going to have the
> impact starting next fiscal year when there is going to be 13,000 less.
> But I think we'll pick up some of that in our other operations.  But I
> think 8,000 or 9,000 or 10,000 of those a day will disappear from
> our operations and that represents about 8% of our, 8% of the hogs
> will be down.  That's for also the fresh pork side.[47]

---

[45] Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 8, 2009) (emphasis
added).

[46] Q2 2010 Smithfield Foods Earnings Conference Call – Final (Dec. 10, 2009).

[47] Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

116.    On March 8, 2010, Wesley Mendonça Batista mentioned Defendant JBS' reduction in hog supply as a driver of profitability, and stated that these efforts were resulting in protein shortages.  Mr. Batista stated:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[48]

Despite having the economic incentive (increased demand) to increase supply and capture market share, JBS adhered to Defendants' agreed upon scheme to limit hog supply.

117.    The Defendants also acknowledged access to information that allowed them to know that the supply of pork would not be increasing.  For example, in December 2010, Larry Pope, the CEO of Smithfield, stated:

> We certainly compare ourselves to our competitors as best we can. ***Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to.  This is information you may not quite have.*** And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[49]

As set forth above, Smithfield had access to competitively sensitive information from its competitors through the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

118.    Supply level information regarding competitors allowed Defendants to know that

---

[48] JBS Q2 2009 Earnings Conference Call (Mar. 8, 2010).
[49] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010) (emphasis added).

supply would not increase in the future, given the lifecycles of the animals.  Based on this

knowledge, in November of 2010 Hormel CFO, Jody Feragan, stated that she did not think the

industry would see large scale expansion given profitability for the pork integrators.[50]

119.   In February 2011, Tyson's chief operating officer (COO) stated:

> I think there is still a widely held belief that our Beef and Pork
> profitability isn't sustainable.  I want to again explain why we don't
> believe that is true.  If we look at supply, current cattle and hogs
> production levels can't change much in 2011 because of the limits
> of the animals' lifecycles.

Again, the way to know the level of production in the industry would be through the provision of

competitively sensitive information by a competitor of Tyson.

120.   In the face of ever-increasing margins, when asked whether the type of profits

would continue, in March 2011, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to

their competitors that it would not increase capacity, even in the face of the clear profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs.  Yet we
> are projecting over the next 90 days we will be up another 20% from
> that.  I mean those are big numbers to get the meat prices in the retail
> and food service case to cover that. . .
>
> HEATHER JONES: So you are just striking a note of caution
> because you know it can't stay this way indefinitely; but it's not that
> you foresee this reversion to that norm over the near term?
>
> BO MANLY: I don't see it on the horizon, on the foreseeable
> horizon.  We are still going to have -- should have good margins,
> but I can't believe --
>
> LARRY POPE: Heather, we are sitting here today, we are halfway
> -- closing in on halfway through our fourth quarter, and we have had
> very good margins through February and March, through today.  We
> have got double-digit margins today.
>
> BO MANLY: It will correct itself over the long run, because this
> type of return on investment would attract capital, would attract

---

[50] Q1 2010 Hormel Foods Corporation Earnings Conference Call – Final (Nov 23, 2010).

expansion, and we kill more pigs and drive the margins lower.  So it will either happen by itself or someone is going to build a plant.

HEATHER JONES: All right, okay.  Thank you.

LARRY POPE: You get two-year visibility on that, though.  You get to know when somebody is building a plant because they have got to file for a permit and they have actually got to build the thing. . . . *And by the way, we are not going to build a new plant to expand capacity.*[51]

121.    In March 2012, the VP of Finance and chief accounting officer of Smithfield stated that no one in the industry would be "real excited about adding capacity" when the losses of 24 to 36 months ago were considered:

Nonetheless, you see some pretty significant fluctuations.  Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30.  So there is some volatility there.  And what I would tell you is that keeps a lid on pork production.  The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry.  *There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.*[52]

122.    In August 2012, Defendant Indiana Packers' president Gary Jacobson commented that the pork company "runs 'on a sold-out position.'"[53]  Mr. Jacobson attempted to make excuses for reducing the supply of pork.  "'It's been a good strong, steady growth,' Jacobson said.  'Indiana is in the heart of corn country and pigs are the heart of corn consumption, so business has been very good.  This summer's heat waves and drought are likely to affect pork prices starting this fall and into the spring,' said Jacobson.  High corn prices make pig farming less profitable, he

---

[51] Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011) (emphasis added).
[52] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012) (emphasis added).
[53] Sarah Einselen, *Food Packing Business Steady So Far*, Pharos-Tribune (Aug. 1, 2012).

explained, both reducing the supply of pork for processing plants come next spring and making

the pork that is on the market more expensive.  In the short run, high temperatures make pigs less

hungry and they don't fatten for market as quickly as they would in a cooler year.  That means

farmers either wait longer to bring their swine to market or take them to market as usual but at a

lighter weight.  'So, the impact has not been really significant as far as production as a whole,'

Jacobson said, but it remains to be seen how the drought will change the plant's supply in the

coming months."[54]

123.    In December 2013, Robert Manly of Smithfield emphasized that coordinated

industry action was necessary to "balance supply and demand":

> So I think you really need to look at the overall industry balance of
> supply and demand to be able to determine, and the industry move
> prices up and collectively as a group.  We've got limited ability to
> do it ourselves if the rest of the industry doesn't follow, but the
> consumer tends to be willing to pay proportionately higher values
> for their pork meat when small increments of supply are withdrawn
> from the marketplace.[55]

124.    On May 15, 2013, Wesley Mendonça Batista continued to demonstrate Defendant

JBS' ability to constrain the pork market.  During a quarterly earnings call, he stated that "[i]n

pork, given some restrictions in supply we have been able to pass price through the system and we

are seeing good margins in our pork business.  So this is a clear sign that we have been able to pass

price increase in chicken and pork and not in the same extent in beef."

125.    Defendants further refused to increase their capacity and gain market share even

when market fundamentals and economics dictated otherwise.  For example, during the 2014

PEDv epidemic, which caused industry supply disruptions, Eric Haman, Defendant Clemens Food

---

[54] *Id.*
[55] Q2 2014 Smithfield Foods Earnings Conference Call (Dec. 23, 2013).

Group's communication manager, stated the disease "'had a very minimal impact on our hog flow, especially when you compare it to others in the industry. . . . That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this.'"[56]  Yet, in furtherance of their conspiracy Defendant Clemens did not take advantage of having few PEDv infected pigs.  Instead of attempting to increase their market share, they stayed the course with their fellow competitors.

126.   In February 2017, Seaboard and Triumph Foods announced plans to expand their joint pork processing facility in Sioux City, Iowa, operated by their 50/50 joint venture Seaboard Triumph Foods, LLC, to include a second shift.[57]  In announcing the potential second shift, Mark Porter, Seaboard Triumph Foods Chief Operating Officer, stated: "The timing of the expansion for a second shift is a result of growing demand for the Seaboard Foods line of quality pork products as well as ongoing growth in the industry."[58]  However, in furtherance of the conspiracy, Triumph/Seaboard postponed the addition of a second shift.[59]

## H.  Abnormal pricing during the relevant period demonstrates the success of the collusive scheme.

127.   Beginning in 2009, the pork industry showed abnormal price movements. According to prices published by the USDA, prices for pork products were less than $1.40/lb from

---

[56] Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

[57] David Eaheart, *Seaboard Triumph Foods Announces Plans to Expand Pork Processing Plant* (Feb. 17, 2017), *available at* https://seaboardfoods.com/news/Pages/Seaboard%20Triumph%20Foods%20announce%20plans%20to%20expand%20pork%20processing%20plant.aspx (last visited June 4, 2019).

[58] *Id.*

[59] Jeff DeYoung, *Pork Packing Capacity Faces Delay to Growth*, Iowa Farmer Today (June 2, 2018), *available at* https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-to-growth/article_f86fde7e-64dc-11e8-b288-475ac8083072.html (last visited June 4, 2019).

2000 to 2009, at times substantially less.  Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping below $1.40/lb again.  (See Figure 5, below.)

**Figure 5: Wholesale Processed Pork Prices, 2000-2017**



As this figure demonstrates, pork wholesale prices increased beginning in 2009, spiked in 2014, and continuously remained at higher levels compared to the years prior to 2009.

128.    Publicly available data also shows that during this period, pork integrators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits that was resistant to changes in price during the relevant period:

**Figure 6: Integrator Earnings per Retail Weight, 2000-2017**



### I.   Overcharges due to the cartel were reflected in higher pork prices.

129.   Pork is a commodity product in which the pork sold by competitors has no meaningful difference and is thus interchangeable.   As such price is driven by the economic fundamentals of supply and demand.   In the words of Tyson Foods, Inc. COO, James Lochner, "As you know decreased supply should be favorable to pricing."[60]

130.   By reducing, stabilizing, and maintaining the supply of pork even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012, the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've

---

[60] Q1 2010 Tyson Foods, Inc. Earnings Conference Call (Feb. 12, 2010).

seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

131.    For example, in 2016, Smithfield reported $3.7 billion of fresh pork sales and an additional $5 billion in packaged pork product sales.    With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiffs.

132.    The Bureau of Labor Statistics tracks commonly purchased products in its Consumer Price Index ("CPI").    Those prices show that the retail price of pork has increased substantially for consumers over the relevant period.    For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.60 at the end of 2017:

**Figure 7: CPI-Average Price Data for Bacon, Sliced, per pound, from 1995-2017**



133.    Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase over the relevant period, moving from $2.05 per pound at the end of 2009 to $2.65 at the end of 2017:

**Figure 8: CPI-Average Price Data for Other Pork, per pound, from 1998-2017**



134.    And the CPI for another commonly purchased consumer item, ham, shows an increase from $2.15 at the end of 2009 to $2.91 at the end of 2017:

**Figure 9: CPI-Average Price Data for Ham, per pound, from 1998-2017**



135.    These price increases were not the result of retailers' desire to move prices upward. Instead, they were the result of increased wholesale prices.  In addition to CPIs, the Bureau of Labor Statistics also maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products.  As shown in Figure 10 below, the processed pork

wholesale prices appear to be the motivator of the higher retail prices, with prices climbing significantly beginning during the conspiracy:

**Figure 10: PPI for Pork, Processed or Cured, Not Canned or Made Into Sausage, from 1995-2017**



136.     Given these market conditions, the overcharge due to Defendants' anticompetitive agreement to artificially increase and stabilize the price and supply of pork was borne in large part by Plaintiffs and other direct purchasers.

**J.  Defendants actively concealed the conspiracy and Plaintiffs did not and could not have discovered Defendants' anticompetitive conduct.**

137.     Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claim for relief.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the filing of a direct purchaser class action, *Maplevale Farms, Inc. v. Agri Stats, Inc. et al.*, in this District in

June 2018.  Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix prices for pork.  Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

138.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats—a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

139.    In 2009, the President of Agri Stats, Brian Snyder, commented on how secretive the true nature of Agri Stats was when he stated:

> Agri Stats has always been kind of a quiet company.  ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect.  We don't advertise.  We don't talk about what we do.  It's always kind of just in the background,*** and really our specialty is working directly with companies about their opportunities and so forth.[61]

140.    At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly, stating "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature

---

[61] Sanderson Farms Investor Day – Final (Oct. 2009) (emphasis added).

of the information."[62]  And yet, despite refusing to show this information publicly, Agri Stats

provided producers with the "bottom line numbers" of their competitors on a regular basis via the

reports discussed above.  These statements acted to conceal the true detail and nature of the Agri

Stats reports from Plaintiffs and the public in general.

141.    Larry Pope, the CEO of Smithfield, made similar references to secret information

in December 2010, explaining that he was confident pork supplies would not be increasing in the

market, based on the following:

> the information we think we have public ***plus what we think we
> know privately***, how many they kill, what their processing levels are
> and things like [that].  ***This is information you may not quite
> have***.[63]

142.    At other times, Defendants attributed the stability in the pork market to other

reasons such as "good programs with our retailers" and "lower grain costs."  As Larry Pope, stated

in June 2012:

> KEN ZASLOW: What evidence do you have to actually give you
> some confidence that fresh pork margins will improve sequentially
> throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with
> our retailers, and lower grain cost in the future and a futures market
> that says the hog market's going to be fine.  I guess beyond that,
> you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US
> consumer may have some greater disposable income from less
> gasoline prices and improvement in the economy.[64]

143.    Not until recently was the fact of the pork industry's use of Agri Stats widely known

---

[62] *Id.*

[63] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010)
(emphasis added).

[64] Event Brief of Q4 2012 Smithfield Foods Earnings Conference Call – Final (June 14, 2012).

or reported.   An investigative article published in February 2017 by Bloomberg Businessweek

suggested the conspiracy that began among Broiler producers and Agri Stats was being replicated

in the pork industry.[65]   The article reported that Agri Stats

> has . . . been branching out into the hog business, which has, over
> the past 30 years, started to look more and more like the chicken
> industry, with hogs being raised under contract for vertically
> integrated companies such as Smithfield Foods.   It appears that
> demand for the service is strong.   At a hog industry trade show in
> 2011, an Agri Stats employee pitched the company's services.   His
> slideshow indicated that 27 companies had already signed up.[66]

While Bloomberg Businessweek article did not conclude that pork producers were engaged in a

horizontal conspiracy, it did suggest for the first time in a widely circulated article that the pork

industry may have been using Agri Stats as a vehicle for collusion similar to the Broiler industry.

144.    Only after the filing of a February 7, 2018, Second Consolidated and Amended

Complaint by the End User Plaintiff Class in the *In Re Broiler Chicken Antitrust Litigation*, Case

No. 1:16-cv-08637 (N.D. Ill.), was there a comprehensive presentation of the full scope of the

confidential services that Agri Stats' provides to its clients in the Broiler industry.

145.    The filing of that amended complaint, along with the February 2017 article by

Bloomberg Businessweek disclosing the pork industry's use of Agri Stats, collectively disclosed

the likelihood that the pork industry was using Agri Stats to share confidential industry information

that could facilitate an anticompetitive conspiracy.

146.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing.

Pork is not exempt from antitrust regulation, and, thus, before these recent events Plaintiffs

---

[65] *See* Christopher Leonard, *Is the Chicken Industry Rigged?*, Bloomberg Businessweek (Feb. 15, 2017), *available at* https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (last visited June 4, 2019).
[66] *Id.*

reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' pork prices before these recent events.

147.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs have as a result of the unlawful combination and conspiracy alleged in this complaint.

## V.    ANTITRUST INJURY

148.    Defendants' anticompetitive conduct had the following effects, among others:

A.  Price competition has been restrained or eliminated with respect to pork;

B.  The prices of pork have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.  Plaintiffs have been deprived of free and open competition; and

D.  Plaintiffs have paid artificially inflated prices.

149.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of pork. As a direct and foreseeable result, Plaintiffs paid supra-competitive prices for pork during the relevant period.

150.    By reason of the alleged violations of the antitrust laws, Plaintiffs have sustained injury to their businesses or property, having paid higher prices for pork than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

151.    This is an antitrust injury of the type that the antitrust laws were meant to prohibit.

## VI.    VIOLATION OF SECTION 1 OF THE SHERMAN ACT

152.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

52

153.    Defendants and all of their co-conspirators entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

154.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

155.    At least as early as January 1, 2009, and continuing until present, the exact dates being unknown to Plaintiffs, Defendants and all of their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain prices for pork, thereby creating anticompetitive effects.

156.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for pork throughout the United States.

157.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for pork.

158.    As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supracompetitive prices for pork.

159.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.  Defendants' conspiracy had the following effects, among others:

   A.  Price competition in the market for pork has been restrained, suppressed, and/or eliminated in the United States;

   B.  Prices for pork sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiffs—which directly purchased pork from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators—have been deprived of the benefits of free and open competition in the purchase of pork.

160. Defendants took all of the actions alleged in this complaint with the knowledge and intended effect that their actions would proximately cause the price of pork to be higher than it would be but for Defendants' conduct.

161. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their business or property and will continue to be injured in their business and property by paying more for pork than they would have paid and will pay in the absence of the conspiracy.

162. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## VII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

163. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

A. An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

B. A *per se* violation of Section 1 of the Sherman Act;

164. Plaintiffs recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

165. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any

manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

166.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

167.    Plaintiffs be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this complaint;

168.    Plaintiffs recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

169.    Plaintiffs receive such other and further relief as the case may require and the Court may deem just and proper.

## VIII.    JURY TRIAL DEMANDED

170.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**THOMPSON TARASEK LEE-O'HALLORAN PLLC**

Dated:  June 14, 2019

*/s/ James W. Anderson*
James W. Anderson (#0337754)
7101 York Avenue S., Suite 255
Edina, MN 55435
Tel: (612) 568-0132
james@ttlolaw.com

*Local Counsel for Plaintiffs Win-Dixie Stores, Inc. and*
*Bi-Lo Holdings, LLC*

Patrick J. Ahern
Theodore B. Bell
**AHERN AND ASSOCIATES, P.C.**
Willoughby Tower
8 South Michigan Avenue, Suite 3600
Chicago, Illinois 60603
Tel: (312) 404-3760
patrick.ahern@ahernandassociatespc.com
theo.bell@ahernandassociatespc.com

*Attorneys for Plaintiffs Winn-Dixie Stores, Inc., and Bi-Lo*
*Holdings, LLC*